UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

UNITED STATES OF AMERICA                                    Plaintiff

v.                                    Criminal Action No. 3:25-cr-58-RGJ

HUMBERTO AVILA MURILLO                                      Defendant

\* \* \* \* \*

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on Defendant Humberto Avila Murillo's ("Avila Murillo")

Motion to Suppress Evidence. [DE 24]. The Court held an evidentiary hearing on March 31, 2026.

[DE 28]. The parties filed simultaneous post-hearing briefs. [DE 30; DE 31]. The United States

responded. [DE 33]. Avila Murillo did not respond and the time to file a response has passed. The

matter is ripe for adjudication. For the reasons below, Avila Murillo's motion to suppress [DE 24]

is **GRANTED IN PART** and **DENIED IN PART**.

I.      **BACKGROUND**

At the March 31, 2026, suppression hearing, the Court heard testimony from Immigration

and Customs Enforcement ("ICE") Deportation Officer John T. Cloyd ("Cloyd"), and Drug

Enforcement Administration ("DEA") Agent Robert Becourvarakis ("Becourvarakis"). [DE 28,

Hr'g Tr. at 106, 141]. Cloyd testified that on March 13, 2025, ICE was "doing operations" in the

Louisville area "going after illegal immigrants that had violated the [Immigration and Nationality

Act]." [*Id.* at 106-07]. Cloyd and Becourvarakis, along with other agents from the DEA, Alcohol,

Tobacco, and Firearms ("ATF"), and the Federal Bureau of Investigation ("FBI") were given a

"stack of different people" to apprehend. [*Id.*].

1

Cloyd testified he was advised of a "target named Humberto Avila Duran" ("Avila Duran"), Avila Murillo's father, who was charged with illegal reentry. [*Id.* at 108; 115]. Cloyd arrived at In and Out Tires on Preston Highway (the "Shop"), in Louisville, Kentucky to "assist" other officers and agents with Avila Duran's apprehension. [*Id.* at 108]. Because Officer Cloyd had arrested Avila Duran twice before for illegal entry—most recently in 2020 at the same Shop— he was "familiar" with him and able to locate him. [*Id.*]. Cloyd had also previously arrested Avila Duran's daughter for illegal entry. [*Id.* at 112].

After formulating a plan with the other officers, Cloyd approached Avila Duran, "place[d] him in handcuffs[,]" and did a "search incident to arrest." [*Id.* at 109]. Becourvarakis was present at Shop but did not participate in the arrest of Avila Duran. [*Id.* at 142-43]. Cloyd testified that following the arrest, Avila Duran stated he was the "only person" at the Shop and asked Cloyd to "pull down the overhead door" to secure the property. [*Id.* at 109-110]. Cloyd testified he had closed the Shop in a similar fashion in 2020. [*Id.*]. Cloyd requested Becourvarakis to assist in closing the garage door. [*Id.* at 145].

To reach the garage door, the officers "pushed through" a set of plastic curtains and entered the business because the "garage door was past the curtains."[1] [*Id.*]. After entering the business, Cloyd saw Avila Murillo "standing by some tires right next to an open door." [*Id.* at 111]. Cloyd told Avila Murillo that Avila Duran stated no one was else was present, and asked Avila Murillo if he "would come outside and talk." [*Id.*]. Cloyd testified that he did not ask Avila Murillo any substantive questions while he was inside, but instead, Avila Murillo complied and agreed to come

---

[1] Becourvarakis and Cloyd offered conflicting testimony on whether Cloyd and Becourvarakis stepped into the shop to close the garage door. Cloyd testified he never stepped foot into the shop. [DE 28 at 128]. Becourvarakis stated both officers walked "several feet" inside the shop. [*Id.* at 153]. Upon the Court's review of the bodycam footage, it is visible that the garage door was behind the curtains.

outside. [*Id.*]. Becourvarakis confirmed this, stating that Avila Murillo "came right out" after encountering the two officers. [*Id.* at 146].

Once outside, and prior to any officer advising Avila Murillo of his *Miranda* rights, Cloyd explained to Avila Murillo why the officers were at the Shop, including Cloyd's recounting of the arrest of Avila Duran. [*Id.* at 111]. According to both officers, Avila Murillo then stated he was Avila Duran's son. [*Id.* at 111, 146]. Cloyd proceeded to ask Avila Murillo questions relating to his immigration status, asserting that he had "reasonable suspicion" that Avila Murillo was not a legal United States citizen based on Cloyd's knowledge of his father's immigration status. [*Id.* at 112, 121, 126]. After some "back and forth," Avila Murillo stated he was not born in the United States. [*Id.* at 112, 147]. This line of questioning continued for roughly five to ten minutes. [*Id.* at 123-24]. Avila Murillo was not in handcuffs during the questioning. [*Id.*]. At different points throughout the questioning, Becourvarakis was standing "next to him, behind him" and "in front of him" to ensure that Avila Murillo "couldn't take off and flee." [*Id.* at 147, 164].

In an effort to formally identify Avila Murillo, other federal agents approached Avila Murillo with a fingerprinting machine. [*Id.*]. As Avila Murillo was about to be fingerprinted, Becourvarakis "noticed a gun in his pocket." [*Id.* at 113, 147]. Specifically, Becourvarakis noticed "the Glock emblem which usually is on the bottom of Glock magazines." [*Id.* at 148]. Cloyd and Becourvarakis then placed Avila Murillo under arrest, handcuffed him, and removed the firearm from his body. [*Id.* at 113, 148]. Homeland Security Investigations ("HSI") Agent Leeker ("Leeker") then provided Avila Murillo his *Miranda* rights. [*Id.* at 114-15].

Following the reading of his *Miranda* rights, Avila Murillo made "statements about the firearm" and stated there were additional firearms in the shop. [*Id.*]. Prior to searching the Shop,

3

Cloyd testified that Avila Duran's sister, whose name is on the lease of the Shop, consented to a search of the property. [*Id.*].

Ultimately, Avila Murillo was charged with one count of possession of a firearm by a prohibited person, in violation of 18 U.S.C. § 922(g)(5)(A) and § 924(a)(8). [DE 5 at 11]. He now moves to suppress his pre-*Miranda* statements, evidence from the entry into the business, and the physical firearm. [DE 24].

## II.     DISCUSSION

### A.  Pre-*Miranda* Statements

Avila Murillo moves to suppress his pre-*Miranda* statements relating to his place of birth and citizenship. [DE 24 at 83]. Under the Fifth Amendment, a defendant may not be "compelled in any criminal case to be a witness against himself." U.S. Const. Amend. V. This privilege applies during a period of custodial interrogation. *Colorado v. Spring*, 479 U.S. 564, 572 (1987); *Miranda v. Arizona*, 384 U.S. 436, 460-61 (1966). In other words, *Miranda* warnings are required when a suspect is interrogated while in custody. *United States v. Woods*, 711 F.3d 737, 740 (6th Cir. 2013) (citations omitted). "Interrogation," in the *Miranda* context, encompasses "any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id*. at 740-41 (quoting *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980)).

Although Avila Murillo was advised of his *Miranda* rights, it was not until *after* the questioning concerning his place of birth and citizenship. [DE 28 at 113; DE 30 at 195]. The United States concedes error on this point, and states all "incriminating statements given prior to being advised of the *Miranda* warning should be suppressed." [DE 30 at 195]. Accordingly, the motion to suppress, as it relates to Avila Murillo's pre-*Miranda* statements, is **GRANTED**.

4

B.  Entry into the Shop

Avila Murillo claims the entry by Cloyd and Becourvarakis into the Shop constituted an unreasonable search and seizure in violation of the Fourth Amendment. [DE 24]. "It is well settled under the Fourth Amendment that a warrantless search is per se unreasonable subject only to a few specifically established and well-delineated exceptions." *Morgan v. Fairfield Cnty.*, 903 F.3d 553, 560–61 (6th Cir. 2018) (cleaned up) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973)). "Under Fourth Amendment jurisprudence, there are two ways in which government action may constitute a search." *United States v. May-Shaw*, 955 F.3d 563, 567 (6th Cir. 2020). First, "when the government gains information by physically intruding into a constitutionally protected area—namely, 'persons, houses, papers, and effects,' U.S. Const. amend. IV—'a search within the original meaning of the Fourth Amendment' has 'undoubtedly occurred.'" *Id*. (quoting *Morgan*, 903 F.3d at 561 and in turn quoting *Florida v. Jardines*, 569 U.S. 1, 5 (2013)). Second, "a search occurs when 'a government official invades an area in which "a person has a constitutionally protected reasonable expectation of privacy."'" *Id*. (quoting *Taylor v. City of Saginaw*, 922 F.3d 328, 332 (6th Cir. 2019) (in turn quoting *Katz v. United States*, 389 U.S. 347, 360 (1967) (Harlan, J., concurring))). Pursuant to *Katz*, "there are two requirements for a government intrusion to constitute a Fourth Amendment search: first, a person must exhibit an actual (subjective) expectation of privacy in the place or thing searched; second, the expectation is one that society is prepared to recognize as reasonable." *May-Shaw*, 955 F.3d at 567 (citation modified) (quoting *Katz*, 389 U.S. at 361). If both elements are not met, the individual lacks standing to contest the search. *United States v. Rogers*, 97 F.4th 1038, 1041 (6th Cir. 2020) (citing *Hicks v. Scott*, 958 F.3d 421, 431 (6th Cir. 2020)).

It is disputed whether the officers entered into the shop. Becourvarakis testified that they did enter the garage area while Officer Cloyd stated they did not. [DE 28 at 128, 153]. According to Becourvarakis, the officers entered the garage area of the Shop by "several feet." [*Id.*]. The officers then saw Avila Murillo in the employee common area. [*Id.* at 155]. This was the "work" area of the Shop, and it is unclear from the record if customers are allowed in this area. [*Id.* at 139, 155].

Avila Murillo, per his affidavit, expressed a subjective expectation of privacy in the employee area. [DE 24-2, Affidavit of Avila Murillo, at 86]. He stated that he encountered the officers in an area of the Shop where "only employees have access." [*Id.*]. And the "general public is not allowed" in this area. [*Id.*]. Thus, because Avila Murillo has expressed a subjective expectation of privacy, Avila Murillo has satisfied the first element. *Rogers,* 97 F.4th at 1041.

The question is therefore whether, as an employee of the Shop, Avila Murillo's subjective expectation of privacy in the employee common area of the Shop is objectively reasonable as recognized by society. The Court considers a number of factors to determine whether an expectation of privacy is objectively reasonable: "(1) whether the defendant was legitimately on the premises; (2) his proprietary or possessory interest in the place to be searched. . . ; (3) whether he had the right to exclude others from the place in question; and (4) whether he had taken normal precautions to maintain his privacy." *United States v. Dillard*, 438 F.3d 675, 682 (6th Cir. 2006) (citing *United States v. King*, 227 F.3d 732, 744 (6th Cir. 2000)). The United States asserts that factors two, three, and four side against Avila Murillo. [DE 30 at 197]. Avila Murillo asserts that because the "agents simply decided to push through the vinyl curtains, enter the garage door, and snoop," the Fourth Amendment has been violated. [DE 31 at 204].

6

"[T]he question whether an employee has a reasonable expectation of privacy must be addressed on a case-by-case basis." *O'Connor v. Ortega,* 480 U.S. 709, 710 (1987). The Sixth Circuit has held that employees retain reasonable expectation of privacy in their private offices, purses, and storage areas. *Bender's, Inc. v. Walker,* 1 F. App'x 317, 323 (6th Cir. 2001) (holding that it is "well established" that "an employee has a reasonable expectation of privacy in his office"); *Shealy v. Caldwell,* 16 F. App'x 388, 400 (6th Cir. 2001) (holding that it is "beyond doubt that society recognizes that an expectation of privacy in purses is reasonable"); *James v. Hampton,* 592 F. App'x 449, 456 (6th Cir. 2015) (holding that an expectation of privacy in the employee's "office and safe" was reasonable). In *Dillard,* however, the Sixth Circuit held that the defendant "did not have a reasonable expectation of privacy in the common hallway" of his apartment because the area was "unlocked and open." 438 F.3d at 682. Although the defendant had a "possessory interest in the common area" he "nonetheless lacked a reasonable expectation of privacy" because he "made no effort to maintain his privacy." *Id.* The court stated that certain factors, such as an open door and easy public access, sided against a finding of a reasonable expectation of privacy. *Id.* Then, in *United States v. Trice,* the Sixth Circuit reaffirmed the core holding of *Dillard*. 966 F.3d 506, 515 (6th Cir. 2020). In *Trice,* the Sixth Circuit held that the defendant had no reasonable expectation of privacy in a common hallway. *Id.* The court held that because the hallway was a "common area" and the "exterior doors" were "ajar," "the hallway was accessible to any passerby." *Id.* Therefore, no reasonable expectation of privacy existed. *Id.*

Here, Avila Murillo cannot establish that he had a reasonable expectation of privacy in the common area of the Shop. Avila Murillo's only evidence of a reasonable expectation of privacy is that he was in the "employees only" area of the Shop. [DE 24-2 at 86]. And although Avila Murillo's father name was on the lease, Avila Murillo did not have any possessory interest in the

business or the Shop. [DE 30 at 198]. And even if he did, he was not in his own private office or private location at all, where the Sixth Circuit has held that a reasonable expectation of privacy may exist. Instead, the common area of the Shop was accessible by an open garage door, and he was located by the officers "right next to [another] open door" immediately after the curtains were separated. [DE 28 at 111]. In other words, Avila Murillo had not "taken [any] normal precautions to maintain his privacy." *Dillard,* 438 F.3d at 682.

And although the officers did not see him until they passed through the vinyl curtains, that does not change the Court's analysis. Avila Murillo was in the middle of a common area that was more than just "ajar" to the public, but was "accessible to any passerby." *Trice,* 966 F.3d at 515. Thus, even if the officers did step into the Shop without a warrant, the majority of factors side against Avila Murillo and he cannot establish standing to assert a Fourth Amendment claim against the search of the Shop. *United States v. Lockridge,* 2026 WL 1314463, at *3 (S.D. Ohio May 13, 2026) (because "Lockridge could not have had any reasonable expectation of privacy in the common area" he "lacks standing to assert the Fourth Amendment against a search of that area"); *see also Neal El v. Showman,* 2024 WL 1210001, *2 (N.D. Ohio Mar. 21, 2024) (holding that there was no reasonable expectation of privacy when the "initial encounter was in a common area of the building.").

Accordingly, Avila Murillo's motion to suppress the entry into the Shop is **DENIED**.

### C. Seizure of Firearm

Lastly, Avila Murillo argues that there was no basis to search him, and that his skin color alone is not probable cause. [DE 24 at 83]. Therefore, "all evidence which flowed" must be "suppressed as fruit of the poisonous tree." [*Id.*]. The United States contends that Avila Murillo "engaged in a consensual encounter with law enforcement." [DE 30 at 198]. And therefore, the

8

seizing of the gun was "lawfully accomplished for officer safety and not, as defendant suggests, as fruit of the poisonous tree." [*Id.*].

Law enforcement officers may briefly detain suspects without violating the Fourth Amendment upon "a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause." *United States v. Sokolow,* 490 U.S. 1, 7 (1989) (quoting *Terry v. Ohio,* 392 U.S. 1, 30 (1968)). In assessing the validity of a detention, courts consider the totality of the circumstances. *Id.* at 7–8. "A person's apparent illegal status in this country may be equivalent to 'criminal activity' and can support a finding of reasonable suspicion." *United States v. Garcia,* 942 F.2d 873, 877 (5th Cir. 1991); *see also United States v. Cortez,* 449 U.S. 411, 418–22, (1981) ("[T]he question is whether, based upon the whole picture, they, as experienced Border Patrol officers, could reasonably surmise that the particular vehicle they stopped was engaged in criminal activity."). An investigative detention conducted by an immigration officer with reasonable suspicion of illegal status is permissible under *Terry. See, e.g., Garcia,* 942 F.2d at 877; *Cortez,* 449 U.S. at 421–22. "Reasonable suspicion can be based upon police officers' own observations or upon the collective knowledge of other officers." *United States v. Braggs,* 23 F.3d 1047, 1049 (6th Cir. 1994).

In the immigration context, "[f]actors such as evasive or erratic behavior, previous experience with illegal aliens in the area, and a manner of dress or speech indicating foreign citizenship may create reasonable suspicion." *Ramirez v. Webb,* 719 F. Supp. 610, 616 (W.D. Mich. 1989) (citing *United States v. Brignoni–Ponce,* 422 U.S. 873, 884–85 (1975)); *see also Valdez v. United States,* 58 F. Supp. 3d 795, 814 (W.D. Mich. 2014). "Hispanic appearance, standing alone, is not sufficient to create a reasonable suspicion of illegal alienage." *Ramirez,* 719 F. Supp. at 616 (citing *Brignoni–Ponce,* 422 U.S. at 885–87). "Reasonable suspicion means only

that immigration officers may briefly stop the individual and inquire about immigration status. . . only if the person is illegally in the United States may the stop lead to further immigration proceedings." *Noem v. Vasquez Perdomo,* 146 S. Ct. 1, 3-4 (2025) (Kavanaugh, J., concurring).

### 1. Seizure

First, the Court must determine whether, and when, Avila Murillo was "seized." *Terry,* 392 U.S. at 30. Factors indicating a seizure versus a consensual encounter include "'the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.'" *United States v. Gross*, 662 F.3d 393, 399 (6th Cir. 2011) (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)). Whether a given encounter is consensual turns on the officer's "objective behavior," not on his or her "subjective suspicion of criminal activity." *United States v. Dingess*, 411 F. App'x 853, 855 (6th Cir. 2011). In other words, courts must evaluate whether the officer "restrain[ed] the person's freedom of movement by means of physical force or a show of authority." *United States v. Marshall,* 446 U.S. 544, 552 (1980). "A seizure has occurred if 'in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'" *United States v. Morris,* 2025 WL 218819, *3 (E.D. Mich. Jan. 16, 2025) (quoting *United States v. Johnson,* 620 F.3d 685, 690 (6th Cir. 2010)).

According to the testimony from both officers, Avila Murillo agreed to go outside and talk to them. [DE 28 at 114, 162, 163]. When Avila Murillo agreed, however, both officers had their weapons out. [*Id.* at 164-65]. And according to Becourvarakis, Cloyd would not let Avila Murillo go until he answered questions about his citizenship. [*Id.* at 164-65]. Further, there were approximately five to ten additional federal officers surrounding Avila Murillo during Cloyd's

questioning, all of whom "had weapons with them." [*Id.* at 132; 173]. During the questioning, Becourvarakis stood behind Avila Murillo and acted as a "security person on him." [*Id.* at 163]. Becourvarakis testified that the purpose of standing behind Avila Murillo was to ensure Avila Murillo "couldn't take off and flee." [*Id.* at 164]. Considering the factors above, the questioning of Avila Murillo constituted a "seizure" because the officers had their weapons out, and told Avila Murillo he was not free to leave which would lead a reasonable person to believe they are not free to leave the encounter. *Campbell v. Cheatham Cnty Sheriff's Dep't,* 47 F.4th 468, 476 (6th Cir. 2022) (holding that a seizure can occur by a "show of authority"); *United States v. Smith,* 594 F.3d 530, 539 (6th Cir. 2010) (holding that when "Officer Putnick asked Smith to stop, a reasonable person would not have felt free to leave"); *United States v. Richardson,* 385 F.3d 625, 630 (6th Cir. 2004) (holding that the defendant was seized when the officer instructed him to "just hang out right here for me, okay?"). "It would be an unnatural reading of the case law to hold that a defendant who is ordered to stop is not seized." *Johnson,* 620 F.3d at 691. As a result, Avila Murillo was seized when Cloyd and Becourvarakis were questioning him outside the Shop with their weapons "clearly visible," and would not let him go until he answered their questions, as no reasonable person would believe that he was free to leave. *Morris,* 2025 WL 218819, at *3.

### 2. Reasonable Suspicion

Once an "individual is 'seized,' the police officer must have a reasonable suspicion of criminal activity to justify a *Terry* stop, or probable cause to justify an arrest, in order for the seizure to comply with the Fourth Amendment." *United States v. Campbell,* 486 F.3d 949, 954 (6th Cir. 2007). Reasonable suspicion is based on the totality of the circumstances. *Sokolow,* 490 U.S. at 7-8. Cloyd asserted that he reasonably suspected that Avila Murillo was in the United States illegally based on his work history, assignment that day, and experience with Avila Murillo's

11

family. [DE 28 at 112, 121, 126]. Officer Cloyd had been with ICE for a minimum of six years. [*Id.* at 107-08]. He had arrested Avila Murillo's father, Avila Duran, on two other occasions, and Avila Murillo's sister on a separate occasion. [*Id.*]. Cloyd had previously arrested Avila Duran at the Shop as well. [*Id.*]. In the immigration context "reasonable suspicion means only that immigration officers may briefly stop the individual and inquire about immigration status. . . only if the person is illegally in the United States may the stop lead to further immigration proceedings." *Vasquez Perdomo,* 146 S. Ct. at 3-4. Here, Cloyd did not ask any substantive questions of Avila Murillo until Avila Murillo identified himself as Avila Duran's son. [DE 28 at 111]. At that point, Cloyd had "reasonable suspicion" to "briefly stop [Avila Murillo] and inquire about [his] immigration status." *Vasquez Perdomo,* 146 S. Ct. at 3-4. Cloyd was permitted to "confirm or dispel his suspicion." *Id.* If Avila Murillo stated he was a United States citizen, he would be "free to go after the brief encounter." *Id.* Here, in response Cloyd's questioning, Avila Murillo admitted to being in the United States illegally and being born in Mexico. [DE 28 at 113, 179]. Accordingly, Cloyd was permitted to further question him. *Vasquez Perdomo,* 146 S. Ct. at 3-4.

Avila Murillo contends that the "location of his birth does not establish probable cause of his crime." [DE 31 at 205]. And while that may be true, Avila Murillo was only being briefly detained pursuant to Cloyd's reasonable suspicion. *See Vasquez Perdomo,* 146 S. Ct. at 3-4. In other words, Cloyd's belief need only be "reasonable suspicion," and did not need to rise to the level of "probable cause." Reasonable suspicion requires more than a "hunch," but less than probable cause. *Sokolow*, 490 U.S. at 7; *see also United States v. Belakhdhar*, 924 F.3d 925, 928 (6th Cir. 2019) (reasonable suspicion "does not present a particularly high bar."). This standard is "considerably short" of a preponderance of the evidence. *United States v. Arvizu*, 534 U.S. 266, 274 (2002); *United States v. Coker,* 648 F. App'x 541, 544 (6th Cir. 2016) (holding that for

reasonable suspicion "the officer needs only a minimal level of objective justification" and "focuses on commonsense inferences from what happened"). Additionally, Avila Murillo admitted to not being in the United States legally and being born elsewhere. [DE 28 at 147 (Avila Murillo "admitted that he was born in Mexico.")]. Therefore, based on a totality of the circumstances, Cloyd was able to "point to specific and articulable facts which, taken together with rational inferences from those facts" demonstrate a reasonable suspicion of Avila Murillo's illegality in the United States, which permitted a brief detention under the Fourth Amendment. *Terry,* 392 U.S. at 21-22; *United States v. Ornelas,* 517 U.S. 690, 696 (1996) (holding that the cause for an officer to detain someone is not a "finely-tuned standar[d]").

During the justified seizure, Becourvarakis saw the "Glock insignia" on Avila Murillo. [DE 28 at 167]. After identifying the weapon, Becourvarakis "grabbed [Avila Murillo's] right hand." [*Id.*]. Avila Murillo was then provided his *Miranda* rights for the first time by Leeker. [*Id.* at 113-14]. After being read his *Miranda* rights, Avila Murillo confirmed the gun was his. [*Id.* 114]. According to Becourvarakis, during this encounter, customers were present at the shop. [*Id.* at 169]. The Sixth Circuit has consistently held that when an officer believes they see a weapon, pursuant to a justified *Terry* stop, an officer is permitted to conduct a brief search of the person for officer safety or public safety. *See, e.g., United States v. Bell,* 572 F. App'x 417, 419 (6th Cir. 2014) ("The officer's belief, based on his eyewitness observations, that the defendant had a bulge in his pocket that was in the shape of a gun provides 'reasonable suspicion' under the Terry doctrine that the defendant was carrying a concealed pistol"); *see also United States v. Galaviz,* 645 F.3d 347, 356 (6th Cir. 2011) (because of a presumption of illegality of a weapon, the "incriminating nature" of a gun imprint is "immediately apparent" to an officer). Thus, the seizure of the weapon from Avila Murillo was permitted because "a reasonable officer would [have]

believe[d], based on specific and articulable facts, that the weapon pose[d] an immediate threat to officer or public safety." *United States v. Bishop*, 338 F.3d 623, 628 (6th Cir. 2003); *see also United States v. Matthews,* 422 F. Supp. 3d 1235, 1254 (W.D. Ky. 2019) (holding that because a "reasonable officer would have believed that the weapon. . . posed an immediate safety threat" seizure of the gun was justified). This remains true even though Kentucky "favors open displays of firearms[,]" because firearms are "inherently dangerous." *Dunkleberger v. Commonwealth,* 719 S.W.3d 17, 26 (Ky. 2025); *United States v. Atchley,* 474 F.3d 840, 850 (6th Cir. 2007).[2] As a result, "even if a loaded handgun is legally possessed" police may seize the weapon for officer and public safety. *Atchley,* 474 F.3d at 850.

In the alternative, if Avila Murillo were to argue that the firearm was illegally seized as a fruit of his pre-*Miranda* statements, this argument would also fail. In *United States v. Patane,* the police recovered a firearm from Patane's residence after the police questioned Patane in violation of his *Miranda* rights. 542 U.S. 630, 635 (2004). The police were only able to locate the gun as a result of the illegal questioning. *Id*. The Supreme Court held that the "*Miranda* rule protects against violations of the Self–Incrimination Clause, which, in turn, is not implicated by the introduction at trial of physical evidence." *Id.* at 634. In turn, the Sixth Circuit has stated, "[a]dmitting physical evidence obtained because of a *Miranda* violation does not implicate a defendant's right against self-incrimination." *United States v. Burton,* 828 F. App'x 290, 292 (6th Cir. 2020). Therefore, the fruit of the poisonous tree doctrine does not apply. *Id.* at 292-93. The failure to provide *Miranda,* "standing alone, cannot justify the exclusion of physical evidence found because of the unwarned

---

[2] The Court acknowledges that whether a noncitizen retains a right to bear arms under the Second Amendment is a disputed question within the Sixth Circuit. *See United States v. Escobar-Temal,* 161 F.4th 969, 986 (6th Cir. 2025) (Thapar, J., dissenting in part and concurring in the judgment). As neither party addressed the matter, the Court need not reach the issue.

statements." *Id.* Only if the statements were "actually coerced" could the physical fruits also be excluded. *Patane,* 542 U.S. at 644.

Here, both officers testified that Avila Murillo's participation in the questioning was voluntary. [DE 28 at 113, 146-47]. Furthermore, Avila Murillo does not allege that he answered any questions due to coercion. Because the questioning was free from actual coercion, the physical fruits of the unwarned interrogation—specifically, Avila Murillo's firearm—are not subject to suppression. *United States v. Lester,* 98 F.4th 768, 775 (6th Cir. 2024) (holding that because the Defendant's answers were voluntary, the district court correctly admitted the gun at trial). Therefore, the "[a]dmission of nontestimonial physical fruits. . . does not run the risk of admitting into trial an accused's coerced incriminating statements against himself." *Patane,* 542 U.S. at 645 (Kennedy, J., concurring).

Accordingly, although Avila Murillo was seized under the Fourth Amendment, the seizure of the firearm was justified and Avila Murillo's motion to suppress the firearm is **DENIED**.

### III.   CONCLUSION

For all these reasons, the Court **GRANTS** in part and **DENIES** in part Avila Murillo's motion to suppress. [DE 24]. Avila Murillo's pre-*Miranda* statements **shall be excluded** from the evidence. All other requests to suppress evidence are **DENIED**. This matter will bet set for a status conference on **July 15, 2026, at 2:00 p.m.** Eastern Time at the U.S. Courthouse in Louisville, Kentucky.

Rebecca Grady Jennings, District Judge
United States District Court

July 7, 2026

15